**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CERTIFIED GUARANTY COMPANY,
LLC,

                Plaintiff,

    v.

ULISES ZANELLO and BREE RIVA,

                Defendants.

Case No. 24-cv-0797 (PKC)

---

**DEFENDANT ULISES ZANELLO'S MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR (1) AN EX PARTE
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INUNCTION
AND (2) AN ORDER AUTHORIZING EXPEDITED DISCOVERY**

---

Samuel I. Portnoy
J. Brugh Lower
Danielle N. Craft
**GIBBONS P.C.**
1 Pennsylvania Plaza
Floor 45, Suite 4515
New York, New York 10119
(212) 613-2000

*Attorneys for Defendant*
*Ulises Zanello*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 4

LEGAL ARGUMENT ............................................................................................... 6

I.     CGC Is Not Entitled to Injunctive Relief as a Matter of Law. ...................... 6

    A.     CGC Has Not Established Likelihood of Success on the Merits. ........................ 7

    B.     CGC Has Not Established Imminent, Irreparable Harm. .................................. 11

    C.     The Balance of Harms Weighs Significantly in Mr. Zanello's Favor. .............. 15

    D.     The Public Interest Weighs in Mr. Zanello's Favor. ......................................... 16

II.    Any Bond Ordered By The Court Must Be Proper to Pay Mr. Zanello The Costs And Damages He Sustains By Being Wrongfully Enjoined Or Restrained. ......................... 16

III.   CGC Has Not Satisfied the Standards For Expedited Discovery. .................. 17

CONCLUSION ......................................................................................................... 17

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Co. v. HSBC Bank USA, N.A.*,
  No. 16-5984, 2016 WL 8813992 (S.D.N.Y. Oct. 21, 2016)...................................................17

*Arcona, Inc. v. Farmacy Beauty, LLC*,
  976 F.3d 1074 (9th Cir. 2020) ..............................................................................................7

*Atari Interactive, Inc. v. Printify, Inc.*,
  No. 23-8926, 2024 WL 283641 (S.D.N.Y. Jan. 25, 2024) ....................................................13

*Chrome Hearts LLC v. Controse Inc.*,
  No. 21-6858, 2023 WL 5049198 (S.D.N.Y. Aug. 8, 2023)....................................................7

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985)..................................................................................................15

*Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*,
  No. 21-0149, 2021 WL 1372658 (S.D.N.Y. Apr. 12, 2021) ..............................................6, 8

*Fashion Wk., Inc. v. Council of Fashion Designers of Am., Inc.*,
  No. 16-5079, 2016 WL 4367990 (S.D.N.Y. Aug. 12, 2016).................................................15

*Freedberg v. Landman*,
  930 F. Supp. 851 (E.D.N.Y.), aff'd, 112 F.3d 503 (2d Cir. 1996).........................................15

*GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*,
  769 F. Supp. 2d 630 (S.D.N.Y. 2011)..................................................................................7, 8

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007), aff'd, 626 F.3d 47 (2d Cir. 2010)..............................................12

*Grout Shield Dist., LLC v. Elie E. Salvo, Inc.*,
  824 F. Supp. 2d 389 (E.D.N.Y. 2011) ...................................................................................8

*Litwin v. OceanFreight, Inc.*,
  865 F. Supp. 2d 385 (S.D.N.Y. 2011)...................................................................................17

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
  75 F. Supp. 3d 592 (S.D.N.Y. 2014).....................................................................................16

*Marlinspike Hall LLC v. Bar Lab Concepts LLC*,
   No. 23-2997, 2023 WL 6847208 (S.D.N.Y. Oct. 17, 2023)......................................13

*Mullins v. City of New York*,
   634 F. Supp. 2d 373 (S.D.N.Y. 2009)........................................................................12

*New Hope Fam. Servs., Inc. v. Poole*,
   966 F.3d 145 (2d Cir. 2020).........................................................................................6

*Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*,
   269 F.3d 114 (2d Cir. 2001).........................................................................................8

*Notaro v. Koch*,
   95 F.R.D. 403 (S.D.N.Y. 1982) ..................................................................................17

*NXIVM Corp. v. Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004).........................................................................................6

*Polaroid Corp. v. Polarad Electronics Corp.*,
   287 F.2d 492 (2d Cir. 1961).........................................................................................8

*Raza v. City of New York*,
   998 F. Supp. 2d 70 (E.D.N.Y. 2013) ..........................................................................17

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010).....................................................................................6, 16

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
   588 F.3d 97 (2d Cir. 2009)...........................................................................................7

*Transcience Corp. v. Big Time Toys, LLC*,
   50 F.Supp.3d 441 (S.D.N.Y. 2014) ............................................................................14

*Two Hands IP LLC v. Two Hands Am., Inc.*,
   563 F. Supp. 3d 290 (S.D.N.Y. 2021)...................................................................11, 12

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*,
   800 F. Supp. 2d 515 (S.D.N.Y. 2011).........................................................................12

*UMG Recordings, Inc. v. OpenDeal Inc.*,
   No. 21-9358, 2022 WL 2441045 (S.D.N.Y. July 5, 2022)......................................6, 13

*Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co., Ltd.*,
   13-7639, 2015 WL 1055933 (S.D.N.Y. Mar. 11, 2015)..............................................15

*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
   423 F.3d 137 (2d Cir. 2005).......................................................................................15

*Wenger S.A. v. Olivet Int'l, Inc.*,
    No. 20-1107, 2024 WL 36864 (S.D.N.Y. Jan. 3, 2024) ..........................................7

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................................15, 16

**Statutes**

15 U.S.C. § 1116(a) ..........................................................................................11

15 U.S.C. § 1116(d)(1)(A) ..................................................................................6

**Rules**

Federal Rule of Civil Procedure 65(c) ..............................................................16

Defendant Ulises Zanello ("Defendant" or "Mr. Zanello") submits this brief in opposition to Plaintiff Certified Guaranty Company, LLC's ("Plaintiff" or "CGC") application for temporary restraints, preliminary injunctive relief, and expedited discovery.

## PRELIMINARY STATEMENT

CGC has burdened this Court and Mr. Zanello with a meritless application for temporary restraints, preliminary injunctive relief, and expedited discovery.  It should be rejected for numerous reasons, chief among them, CGC's failure to show any imminent threat of irreparable harm, which is easily rebutted even if presumed.  CGC claims it needs emergent relief to: (1) avoid continued infringement and consumer confusion (which CGC claims can be accomplished by preventing Mr. Zanello from selling CGC graded books); and (2) prevent spoliation of evidence. The first concern could have been resolved by a single phone call or email.  Although Mr. Zanello disputes CGC's allegations and plans to vigorously defend against its claims, he will agree not to sell any CGC graded or holdered books in his possession without CGC's consent while this dispute is pending, something CGC would have known had they simply asked.[1]

Even if Mr. Zanello were unwilling to agree to that restraint, an order imposing it would be unnecessary.  On January 3, 2024 CGC published a list of all books it believes to have been affected by the conduct alleged in its Complaint, identifying them with specificity—by certification number, title, issue number, variant, year of publication and grade.  And in an interview published January 15, CGC President Matt Nelson stated: (i) CGC is "not aware of any

---

[1] In support of CGC's application, CGC's counsel avers that they "spoke to counsel for Zanello in early January regarding this matter and were promised a response" but "have not heard back." (ECF No. 12 ¶ 8).  That is not true.  Counsel have communicated on several topics this past month, including Mr. Zanello's consent to CGC's request to evaluate certain books in their possession, and to schedule a meeting to explore a potential resolution of this dispute.  On January 25, counsel for Mr. Zanello proposed two dates for that meeting.  CGC's counsel did not respond.  Instead, CGC ambushed Mr. Zanello with this lawsuit.  *See* Declaration of Samuel I. Portnoy ("Portnoy Decl.") ¶¶ 3–5, 7–8 & Ex. B.

other books that were targeted besides these 350 that we posted;" (ii) CGC does not "expect every book on that list to be tampered with;" (iii) the purported situation involves "a small number of books"; and (iv) he has "faith that this is small in nature in terms of the number and it's contained." These admissions foreclose a finding of imminent, irreparable harm to reputation or goodwill as a matter of law.

CGC's assertion that it needs injunctive relief and expedited discovery to prevent spoliation of evidence is baseless and belied by the record. Mr. Zanello has been repeatedly advised, verbally and in writing, of his obligation to preserve all potentially relevant evidence in his possession. CGC's counsel was informed of this over a month ago. CGC offers no credible evidence to suggest Mr. Zanello is not complying with his preservation obligation. Notwithstanding that total lack of support, CGC would have the Court believe that spoliation is so sure and imminent that its request for temporary restraints had to be made *ex parte* and granted on not even a single day's notice.[2] But in those same papers, CGC suggests Mr. Zanello was aware of potential claims against him since mid-December and confirms that counsel have been in contact about them since January 5. CGC cannot have it both ways. They cannot be heard for the proposition that temporary restraints and expedited discovery are not only needed, but needed *ex parte*, because Mr. Zanello would immediately spoliate evidence while, at the same time, affirmatively assert that Mr. Zanello has been aware of the potential claims against him for nearly two months.

CGC's application should also be denied because CGC has failed to demonstrate a likelihood of success on the merits. CGC's application rests upon conclusory allegations and

---

[2] Despite CGC's asserted need for absolute secrecy and to avoid providing Mr. Zanello with any notice whatsoever to prevent spoliation, CGC filed its application **publicly** on February 2, 2024, only further undermining its claimed need for *ex parte* restraints and its assertion that spoliation would be imminent.

conjecture based on purported online statements from unnamed third parties (at best constituting hearsay insufficient to support an injunction), without evidence of a single specific comic book sold or offered for sale by Mr. Zanello.  The only specific comic books identified anywhere in CGC's application were, by CGC's admission, never reholdered or returned to Mr. Zanello and so, not offered for sale—a core element that CGC must establish to prove its infringement claims.  And, the recorded statements of CGC's own agents support a conclusion that the books very well could have been submitted by mistake because such mistakes are common.  Contrary to CGC's position in its brief, likelihood of success is not presumed in cases involving claims of counterfeiting, and CGC has failed to offer any evidence of likelihood of confusion, a defect fatal to its application.

Because CGC has made no competent showing of irreparable harm or likelihood of success on the merits, the balance of harms tips decidedly in Mr. Zanello's favor, who should not be forced to endure the burdens of grossly overbroad and ambiguous restraints, and the considerable expenses associated with expedited discovery.  CGC's complete lack of support for its application, particularly with respect to irreparable harm, also renders it contrary to the public's interest.  To grant injunctive relief on such a deficient showing would set a dangerous precedent, lowering the bar for that extraordinary remedy to an extent that will invite abuse.

Assuming the Court is not inclined to dismiss this Complaint outright—as the Middle District of Florida did last week with a complaint brought by CGC against its own employees alleging similar claims—there is no valid reason to prevent this litigation from proceeding in the normal course (including a potential motion to dismiss and, if necessary, affirmative defenses and counterclaims).

## **FACTUAL BACKGROUND**

CGC asserts that it has certified more than 85 million collectibles in the last 36 years. Portnoy Decl., Ex. A.  In December 2023, CGC issued a press release describing an incident of an unnamed individual allegedly tampering with holders for its graded comic books and asserting an intention to prosecute that individual to the fullest extent of the law.  *Id.* ¶ 2.  On January 3, 2024, CGC issued an updated version of the press release, which includes a list of all books it believes to have been affected by the alleged tampering, identifying them by certification number, title, issue number, variant, year of publication, and grade.  *Id.* ¶ 2 & Ex. A.  A total of 350 books were identified.  *Id.*

On January 5, 2024, counsel for CGC and counsel for Mr. Zanello spoke by phone.  *Id.* ¶ 3.  On that call, counsel discussed, among other topics, scheduling a meeting to discuss a potential dispute between our clients (including potential claims by Mr. Zanello), and to explore a potential resolution.  *Id.* CGC's counsel asked if a meeting could be set for the following week.  *Id.*  Mr. Zanello's counsel asked for additional time to confer with Mr. Zanello and suggested the meeting might be more productive if CGC could identify any specific books on their published list that were of particular concern.  *Id.*  CGC's counsel agreed to discuss that request with her client and get back to Mr. Zanello's counsel.  *Id.*  During that same call, CGC's counsel said her client was concerned about potential spoliation.  *Id.*  Mr. Zanello's counsel informed CGC's counsel that Mr. Zanello had been advised repeatedly of his obligation to preserve all potentially relevant documents and information in his possession.  *Id.*

On January 10, 2024, CGC's counsel emailed Mr. Zanello's counsel stating that Comic Link had sent CGC three books belonging to Mr. Zanello and had requested that two be reholdered and all three sent back.  *Id.* ¶ 4 & Ex. B.  CGC's counsel also wrote:

> Obviously this puts my client in an odd spot, because this is material
> pertaining to an investigation and we wouldn't want anyone being
> accused of spoliating anything.  My client proposes that the two
> books that are requested for re-holdering be evaluated by my client,
> with a recording to document the process in order to ensure that we
> do our best to preserve evidence, and once that is done, we can send
> the books back.  Let me know if that works.  Comic Link is pushing
> on us, so the sooner I can hear back, the better.

*Id.*  On January 12, 2024, Mr. Zanello's counsel responded to CGC's counsel consenting to CGC's proposal.  *Id.* ¶ 5 & Ex. B.

On January 15, 2024, an interview with CGC President Matt Nelson was published on YouTube.  *Id.* ¶ 6.  During that interview, Mr. Nelson stated that there is a very "specific group of books at issue" and CGC is "not aware of any other books that were targeted besides these 350 that we posted."  *Id.*  Mr. Nelson also stated that to date "there hasn't been evidence of any books that have been tampered with outside of this original list."  *Id.*  Mr. Nelson also stated "this list does not necessarily mean that all 350 books were tampered with . . . it's our belief that there are some books on there that are not tampered with . . . ."  *Id.*  Mr. Nelson also stated "we cast the net and don't expect every book on that list to be tampered with."  *Id.*  Mr. Nelson identified one specific book on the list that was confirmed "cleared" and "okay."  *Id.*  Mr. Nelson stated that the situation involves a "small number of books."  *Id.*  Mr. Nelson also stated that "it seems like the situation is contained so far."  *Id.*  Mr. Nelson also stated "I have faith that this is small in nature in terms of the number and it's contained . . . ."  *Id.*

On January 25, 2024, CGC's counsel wrote requesting confirmation that the undersigned still represents Mr. Zanello and stating "[t]his situation continues to be troubling, and we aren't inclined to let things stall.  Please advise.  Thank you."  *Id.* ¶ 7 & Ex. B.  The next day, January 26, 2024, the undersigned responded "[y]es, I still represent Mr. Zanello.  I've now had a chance to confer with him in more detail and can be in a position to have a more detailed and hopefully

productive conversation with you next week.  I am a bit tied up early in the week, but have good availability Wednesday and Thursday.  Let me know if either will work.  In the meantime, have a good weekend." *Id.* ¶ 8 & Ex. B.  Aside from an automatically generated out-of-office notification, Mr. Zanello's counsel received no response to that email.  *Id.*  The next communication Mr. Zanello's counsel would receive from CGC's counsel was an email sent the afternoon of February 5, 2024 attaching CGC's complaint and the application at issue.  *Id.*

## LEGAL ARGUMENT

### I.    CGC Is Not Entitled to Injunctive Relief as a Matter of Law.

To prevail on a motion for injunctive relief, CGC is required to establish: "'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor.'" *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (alteration in original; quoting *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476 (2d Cir. 2004)).  In addition, CGC must establish irreparable injury in the absence of an injunction.  *Id.* at 79–80.  Accordingly, CGC must "submit evidence sufficient for the Court to conclude that [it is] likely to prove both a likelihood of success on the merits, and a showing of irreparable harm, by a preponderance of the evidence."  *UMG Recordings, Inc. v. OpenDeal Inc.*, No. 21-9358, 2022 WL 2441045, at *3 (S.D.N.Y. July 5, 2022) (citing *Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*, No. 21-0149, 2021 WL 1372658, at *5 (S.D.N.Y. Apr. 12, 2021)).  At the preliminary injunction stage, courts are "not required to accept all [of CGC's] allegations as true or to draw all reasonable inferences in its favor."  *New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020).  As discussed below, CGC cannot meet its burden.[3]

_____

[3] Although CGC purports to seek an *ex parte* remedy pursuant to 15 U.S.C. § 1116(d)(1)(A) (Mov. Br. at 10), its Complaint and papers filed in support of its request for injunctive relief were filed

A.     <u>**CGC Has Not Established Likelihood of Success on the Merits.**</u>

To prevail on a trademark infringement and counterfeiting claim, CGC must establish that its marks are protected and that Mr. Zanello's "use of the allegedly infringing mark would likely cause confusion as to the origin or sponsorship." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). "'The crucial issue in an action for trademark infringement' is whether there is a 'likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled' or 'confused' as to a product source." *GoSMiLE, Inc. v. Dr. Jonathan Levine, D.M.D. P.C.*, 769 F. Supp. 2d 630, 637 (S.D.N.Y. 2011) (Castel, J.) (quoting *Starbucks Corp.*, 588 F.3d at 114).

CGC completely glosses over likelihood of confusion, simply contending that the essential element can be presumed in cases involving alleged counterfeiting. (Mov. Br. at 11–23). CGC is wrong and relies on outdated case law. Courts in this District most recently have followed the Ninth Circuit's holding in *Arcona, Inc. v. Farmacy Beauty, LLC*, 976 F.3d 1074, 1079 (9th Cir. 2020), which requires counterfeit claimants to show a likelihood of confusion. *See Chrome Hearts LLC v. Controse Inc.*, No. 21-6858, 2023 WL 5049198, at *9 (S.D.N.Y. Aug. 8, 2023) ("It follows from the plain language of the statute that a plaintiff seeking the enhanced form of relief available for the unauthorized use of a counterfeit must establish . . . that the defendant's use of that mark creates a likelihood of confusion) (citing *Arcona*); *see also Wenger S.A. v. Olivet Int'l, Inc.*, No. 20-1107, 2024 WL 36864, at *2 (S.D.N.Y. Jan. 3, 2024) ("Although it was not the subject of this motion, a plaintiff on a counterfeiting claim must also show likelihood of confusion.").

---

on the public docket on Friday, February 2, 2024. CGC's publication of its application is in direct contravention to counsel's certification. (*See* Decl. of Matt Nelson ("Nelson Decl."), ECF No. 10 ¶ 1 (incorrectly declaring that "CGC has not publicized this motion")).

As CGC has relied purely on a presumption of a likelihood of confusion, it cannot demonstrate a likelihood of success on merits under the non-exhaustive factors set forth in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).[4]  And, CGC has failed to even provide sufficient evidence of any counterfeiting in the first place, let alone sufficient evidence to establish likelihood of confusion.

CGC relies on a single declaration from Matt Nelson, President of CGC, to support its counterfeiting claims.  This declaration is woefully inadequate.  *See, e.g.*, *Engine Cap. Mgmt., LP*, 2021 WL 1372658, at *8 (five affidavits, including two from investors, insufficient to support a likelihood of consumer confusion) ("While the handful of instances of confusion Engine Capital has offered support a finding that confusion might occur, such a small number of instances is insufficient to support a finding that widespread confusion is *likely* to occur."); *see also Grout Shield Dist., LLC v. Elie E. Salvo, Inc.*, 824 F. Supp. 2d 389, 415-16 (E.D.N.Y. 2011) (noting that six instances of confusion were de minimis in denying a motion for a preliminary injunction); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (affirming the district court's conclusion that two anecdotes of confusion were de minimis).  CGC has failed to provide evidence of any specific comic book that was sold or offered for sale by Defendants that was not what it purported to be, instead making bald, generalized assertions and conclusory allegations with no evidentiary support whatsoever.  This is not only a failure with regard to demonstrating likelihood of confusion, it is a failure to demonstrate that Defendants engaged in counterfeiting in the first place.

---

[4] The *Polaroid* factors include: "(1) the strength of the mark; (2) the similarity of the parties' marks; (3) the proximity of the parties' products in the marketplace; (4) the likelihood that the plaintiff will "bridge the gap" between the products; (5) evidence of actual consumer confusion; (6) whether the defendant acted with bad faith in adopting the mark; (7) the defendant's product quality; and (8) consumer sophistication."  *GoSMiLE, Inc.*, 769 F. Supp. 2d at 637.

First, CGC contends that it became aware of "a major issue" with Defendants submissions through a post on Instagram by an unnamed social media influencer, Nelson Decl. ¶ 16, but CGC provides no declaration from that person, no details concerning the alleged "major issue," and no details concerning any particular comic books that Defendants allegedly sold or offered for sale. Second, CGC contends that it undertook an investigation, "which has resulted in a finding that a significant number of comic books submitted by Defendants were swapped," Nelson Decl. ¶ 17, yet CGC does not explain what constitutes a "significant number," which particular comic books were purportedly swapped, or whether those comic books were ever actually sold or offered for sale by Defendants.  Moreover, it is unclear whether this "significant number" of comic books is simply referring to the three comic books that were mistakenly submitted for reholdering on or around December 15, 2023, Nelson Decl. ¶¶ 12–15.  Third, CGC contends that "due to online reporting, multiple third parties have contacted CGC to note that they have been duped by Defendants' fraudulent scheme," Nelson Decl. ¶ 17.  But again, CGC provides no other information regarding these alleged third parties or their allegations, whether CGC investigated those allegations, what the result of any of those investigations was, or any information regarding a specific comic book sold or offered for sale by Defendants to these third parties.  CGC also states that it "recently discovered that, in at least one instance, Defendants swapped out a CGC-certified comic book and sold the inferior, lower-value comic book in its place in the original," Nelson Decl. ¶ 11; but again, absolutely no other detail or information is provided by CGC to substantiate this bald allegation.  Finally, CGC contends that it "became aware of a large and well-respected comic book auction firm, ComicLink, was in possession of a number of potentially swapped comic books in CGC holders consigned to them by Defendants,"  Nelson Decl. ¶ 18.  However, CGC provides no further information and provides zero evidence (or even an allegation) that these comic

books were actually "swapped"—CGC just baldly claims that they were "potentially swapped." The omission is curious in light of CGC's counsel's representation on January 10, 2024 that CGC planned to examine them.  Portnoy Decl. ¶ 4 & Ex. B.

The only specific information CGC provides with respect to any comic books relates to the three comic books submitted by Mr. Zanello to CGC for reholdering on or about December 15, 2023.  Nelson Decl. ¶¶ 12–15.  But, as CGC admits, it did not reholder those comic books or return them to Mr. Zanello, which on its own forecloses any claim based on them.  Indeed, CGC has submitted no evidence or made any allegation that these three comic books were ever even offered for sale by Defendants (an essential element of CGC's claims), and, as CGC admits, Mr. Zanello himself brought his mistaken submission of these books to CGC's attention.  Notably, the audio files of Mr. Zanello's calls with CGC's agents, which CGC has provided but does not cite or provide transcripts for, demonstrate that such mistaken submissions are common.  Indeed, the CGC agent on those calls told Mr. Zanello "[i]t happens, you're not the first, we should be able to pull it," that he should "try not to worry, it happens all the time," and that he is "not the first" and "won't be the last for sure."  (ECF No. 10-1).

Finally, it bears noting that CGC itself has identified a potential explanation for the purported "swapping" of certain comic books and the reports from unidentified third parties and social media regarding such allegations, which also weighs against CGC's likelihood of success. Two days before filing its Complaint in this action, CGC filed a separate complaint against **_its own employees_** for trademark infringement and counterfeiting, alleging that they "abused their roles and privileges at CGC, including, _inter alia_, converting customers' property, selling collectible materials in violation of CGC policies, and printing CGC labels bearing CGC's name and trademarks in order to improperly label lower-grade collectible products as higher-grade

collectible products, with the goal of deceiving innocent members of the public in exchange for ill-gotten profits." *Certified Collectibles Group, LLC and Certified Guaranty Company, LLC v. Terrazas, et al.*, Middle District of Florida, Civil Action No. 24-301, ECF No. 1 ¶ 1. CGC further alleges that its employees were responsible for "'swapping' in duplicates of CGC-branded labels with higher grades, thereby misrepresenting lower-grade collectible products as higher-grade collectible products." *Id.*, ECF No. 1 ¶ 54. CGC chose not to bring that suit or its allegations to this Court's attention, or inform this Court that its complaint in that case, which contains nearly word for word allegations within the same counts asserted against Defendants here, was dismissed by the court *sua sponte* as a "shotgun pleading." *Id.*, ECF No. 9.

In short, CGC has failed to identify a single "counterfeit" comic book sold or offered for sale by Defendants, and it has provided no evidence demonstrating a likelihood of confusion. Accordingly, CGC has completely failed to satisfy its burden of demonstrating a likelihood of success on the merits sufficient to afford it the extraordinary remedy of injunctive relief.

### B.    <u>CGC Has Not Established Imminent, Irreparable Harm.</u>

CGC is correct that the Trademark Modernization Act of 2020 provides that a party seeking injunctive relief is entitled to a rebuttable presumption of irreparable harm if the court finds a likelihood of success on the merits. 15 U.S.C. § 1116(a). Accordingly, if "(1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), and (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm." *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021). However, the presumption does not arise in this matter because, as explained above, CGC has not shown a likelihood of consumer confusion. *See id.* Even if the Court reaches this inquiry, the presumption is easily rebutted.

"To satisfy the irreparable harm requirement, plaintiff[] must demonstrate that absent a preliminary injunction[, it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Mullins v. City of New York*, 634 F. Supp. 2d 373, 386 (S.D.N.Y. 2009) (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)), *aff'd*, 626 F.3d 47 (2d Cir. 2010). "Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither calculable nor precisely compensable." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) (internal quotation marks and citations omitted). But movants "must do more than assert that confusion itself will irreparably injure them, and conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Two Hands IP LLC*, 563 F. Supp. 3d at 301 (no irreparable harm where movant failed to allege that "it will lose control over its reputation, nor provided sufficient evidence showing a possible loss of goodwill in the industry") (internal quotation marks omitted).

In this regard, *Two Hands IP LLC*, a case relied upon by CGC, is particularly instructive. 563 F. Supp. 3d at 301. The Court explained that "[a] few instances of consumer confusion that is dispelled upon further inquiry is not equivalent to evidence of irreparable harm." *Id.* Here, over a month ago, CGC published a list of all 350 books it believes were affected by the conduct alleged in its complaint. *See* Portnoy Decl. ¶ 2, Ex. A.[5] CGC's list identifies the potentially affected books with detail and specificity. Moreover, nearly two weeks after the list was published, CGC's president asserted that the list identifies every book **potentially** implicated, that they do not believe

---

[5] According to CGC, it has "**certified more than 85 million collectibles."** *Id.*, Ex. A (emphasis added).

every book on the list has been tampered with, and that the purported situation involves a small number of books.  CGC's list and statements demonstrate there is currently no danger of consumer confusion that poses a threat of harm to CGC's reputation or goodwill.  Indeed, even if its allegation are accepted as true, potential consumers can readily determine whether they purchased or may purchase a book on CGC's public list.

As CGC's president asserted, "I have faith that this is small in nature in terms of the number and it's contained . . . ."  Portnoy Decl. ¶ 6.  Thus, even if irreparable harm can be assumed in this case, CGC's list and statements strongly rebut that assumption.  *See, e.g.*, *Atari Interactive, Inc. v. Printify, Inc.*, No. 23-8926, 2024 WL 283641, at *9 (S.D.N.Y. Jan. 25, 2024) (injunctive relief denied where there was "no evidence whatsoever . . . that the actual infringing goods are inferior in quality relative to [plaintiff's] products and . . .  no evidence that any consumer has been confused as to the origin of his or her purchases"); *Marlinspike Hall LLC v. Bar Lab Concepts LLC*, No. 23-2997, 2023 WL 6847208, at *10 (S.D.N.Y. Oct. 17, 2023) (injunctive relief denied where "plaintiff has not shown that it is likely to lose control over its reputation, nor has it provided sufficient evidence showing a possible loss of goodwill in the industry") (internal quotations omitted); *UMG Recordings, Inc.*, 2022 WL 2441045, at *10 (conclusory statements of loss of reputation insufficient where "[plaintiff] has adduced no evidence demonstrating that [defendant's] products or services are of such inferior quality that they pose a risk to [plaintiff's] reputation").

CGC also cannot demonstrate irreparable harm resulting from continued infringement or possible consumer confusion because Mr. Zanello will voluntarily agree to refrain from selling any books in his possession in holders bearing the CGC mark for the duration of this litigation (absent any sales CGC or its counsel would authorize or authorization by Court Order).

Nor has CGC made any credible showing of an immediate threat of spoliation. As counsel for CGC has been informed, Mr. Zanello was advised repeatedly of his obligation to preserve relevant evidence. Portnoy Decl. ¶ 3. CGC offers absolutely no evidence to suggest he is not complying with his obligation.[6] And, according to CGC, Mr. Zanello was on notice of potential claims against him by mid-December. By the end of the month, CGC had issued a public statement about the alleged conduct and, on January 3, published the full list of books it believed to be impacted. Portnoy Decl. ¶ 3, Ex. A. In those press releases, CGC stated it intended to prosecute the person responsible. By the first week of January, counsel for the parties were communicating and CGC's intent to take action against Mr. Zanello was reiterated. But, in this application, CGC contends that it could not give Mr. Zanello so much as a day's notice of this lawsuit due to spoliation fears. The proposition is disingenuous and cannot be reconciled with the record, particularly in light of the communications among counsel.

In fact, CGC's delay in seeking an injunction and temporary restraints should foreclose its application on its own. "It is well-established in this Circuit that delays in moving for injunctive relief to protect copyrights and trademarks from further unauthorized use weigh heavily against the movant." *Transcience Corp. v. Big Time Toys, LLC*, 50 F.Supp.3d 441, 457–58 (S.D.N.Y.

---

[6]    CGC also offers no evidence to suggest that Mr. Zanello's request for the return of one of his submissions (which CGC did not honor) was made for any nefarious purpose. In fact, the CGC agent who assisted Mr. Zanello admitted—on two separate occasions—that such requests "happen[] all the time" and that "[he's] not the first" and "won't be the last." (*See* ECF No. 10-1, audio recordings).

Mr. Zanello setting up an LLC (*after* the conduct about which CGC complains already occurred) is likewise apropos of nothing. CGC makes no showing as to any purpose for which the LLC was created, let alone a showing that it was involved in any of the sales at issue. The potential use of a pseudonym to sell products on eBay (conduct authorized by the site and engaged in by any number of its millions of members) is insufficient to support the extraordinary and burdensome remedies CGC seeks.

14

2014).    Indeed, "[c]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT Indus. Co., Ltd.*, 13-7639, 2015 WL 1055933, at \*4 (S.D.N.Y. Mar. 11, 2015); *see also Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir. 1985) (finding that a ten-week delay rebutted a claim of irreparable injury).

### C.    <u>The Balance of Harms Weighs Significantly in Mr. Zanello's Favor.</u>

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).    As discussed above, CGC will suffer no irreparable harm by denial of its request for temporary restraints.    They know the universe of books purportedly effected, and Mr. Zanello will agree not to sell any more of them while the case is pending; nor is there any credible concern of spoliation.    Conversely, Mr. Zanello will face serious, irreparable harm if the Court grants any injunctive relief against him—specifically the cost, expense and burden imposed by grossly overbroad and ambiguous restraints and needlessly expedited discovery.[7]    *See, e.g., Fashion Wk., Inc. v. Council of Fashion Designers of Am., Inc.*, No. 16-5079, 2016 WL 4367990, at \*9 (S.D.N.Y. Aug. 12, 2016) (finding equities tipped "in favor of the defendants who would be seriously impacted if they were enjoined"); *see also Freedberg v. Landman*, 930 F. Supp. 851, 856

---

[7] For example, if injunctive relief is issued beyond Mr. Zanello's voluntary cessation of CGC sales, he would be subject to overbroad and ambiguous discovery sought by CGC, such as "complete"– i.e., lifetime–"sales records for any and all sales [that] . . . in any way involve[e] Defendants, including but not limited to, the number of units sold, the purchaser of such products, the price per unit, total gross revenues received (in U.S. Dollars), and the dates thereof."  (ECF No. 8 at 3).

(E.D.N.Y.), aff'd, 112 F.3d 503 (2d Cir. 1996) (weighing the balance of hardships in defendant's favor "in view of the substantial expenditures that [defendant] has made").

    **D.**    <u>**The Public Interest Weighs in Mr. Zanello's Favor.**</u>

Finally, granting Plaintiff's request for a preliminary injunction would not serve the public interest. *See Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 609 (S.D.N.Y. 2014) ("The Court must also 'ensure that the public interest would not be disserved by the issuance of a preliminary injunction.'" (quoting *Salinger*, 607 F.3d at 80)).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.  Here, a preliminary injunction is against the public's interest because it would set a dangerous precedent.  The merits evidence offered by CGC is nowhere near sufficient to demonstrate a likelihood of success, and its claims of imminent irreparable harm are meritless, illogical, and belied by CGC's own application, conduct and statements.  To grant this application would set a perilously low bar for relief that is meant to be granted only sparingly in truly exigent circumstances.

**II.**    <u>**Any Bond Ordered By The Court Must Be Proper to Pay Mr. Zanello The Costs And Damages He Sustains By Being Wrongfully Enjoined Or Restrained.**</u>

Pursuant to Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the cost and damages sustained by any party found to have been wrongfully enjoined or restrained."  Should the Court issue a temporary restraining order, Mr. Zanello respectfully requests that CGC post a bond of $4,000,000, consistent with its representation of the aggregate value of comic books Mr. Zanello has submitted to CGC.  (ECF No. 1 ¶ 46).

**III.    <u>CGC Has Not Satisfied the Standards For Expedited Discovery.</u>**

"Courts in the Second Circuit employ two tests for determining the propriety of an expedited discovery request." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 402 (S.D.N.Y. 2011). The first is the "flexible standard of reasonableness and good cause." *Raza v. City of New York*, 998 F. Supp. 2d 70, 75 (E.D.N.Y. 2013). "The second is a four-factor test set out in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982)." *Litwin*, 865 F. Supp. 2d at 402. Under *Notaro*, a party requesting expedited discovery must show: "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted." 95 F.R.D. at 405.

For the reasons already discussed, CGC has come nowhere near a showing sufficient to warrant expedited discovery, particularly for failure to show likelihood of success, any possibility of irreparable harm, and the burden such discovery would impose. *See, e.g.*, *3M Co. v. HSBC Bank USA, N.A.*, No. 16-5984, 2016 WL 8813992, at *1–2 (S.D.N.Y. Oct. 21, 2016) (expedited discovery found "not reasonable" and denied where it was "highly unlikely" that the party would be able to complete the discovery on the proposed "expedited" schedule before the temporary restraining order expired); *see also Raza*, 998 F. Supp. 2d at 76 & 88 (rejecting plaintiff's timeline for expedited discovery in support of contemplated motion for a preliminary injunction).

<u>**CONCLUSION**</u>

In light of the foregoing, Mr. Zanello respectfully requests that this Court deny Plaintiff's request for temporary restraints, preliminary injunctive relief, and expedited discovery.

Dated:  February 7, 2024                    Respectfully submitted,


                                            s/ Samuel I. Portnoy
                                            Samuel I. Portnoy
                                            J. Brugh Lower
                                            Danielle N. Craft
                                            **GIBBONS P.C.**
                                            1 Pennsylvania Plaza
                                            Floor 45, Suite 4515
                                            New York, New York 10119
                                            (212) 613-2000
                                            sportnoy@gibbonslaw.com
                                            jlower@gibbonslaw.com
                                            dcraft@gibbonslaw.com

                                            *Attorneys for Defendant*
                                            *Ulises Zanello*